Good morning. We have two cases this morning. Council for Lewis v. Geico, please get yourselves ready at the table, and when you're set up, we can begin. But take your time. May it please the Court. My name is Kimberly Cochis, and I am here today on behalf of Defendant Appellant Geico. And I've reserved three minutes of rebuttal time. Great. Currently before the Court is Geico's appeal of the District Court's order certifying two classes in this case. Is it two classes or one? The District Court switches its language back and forth, usually referring to it in the singular. The actual class that was certified, the sentence says, class is. And plaintiff's complaint refers to class is. So I believe it's two classes because they're seeking two fundamentally different claims, which doesn't seem to be in dispute. All right. We'd like to hear what Appellee's position is when you stand up on that. But please go ahead. Thank you. I will focus today on the following three key arguments relating to the vehicle evaluation class or vehicle evaluation claims, if the Court believes it's one class. First, the District Court's error in allowing named plaintiffs to represent a class challenging a business practice that they were unharmed by. Second, the District Court's error in ignoring that plaintiffs and each class member will need to demonstrate that they were underpaid the actual cash value of their vehicle. In order to determine whether Geico underpaid, it would require individualized issues. Finally, the District Court's error in granting certification based on a purported damages model that does not measure the harm in this case, whether the claim was underpaid. First, standing. All right. So could you go, first of all, where specifically are you looking for the proposition that this is two classes rather than one? I'm looking at the orders here. I see plaintiff's motion to certify classes granted. But where the class is defined, you'll see that the District Court says in the sentence before the class definition. Where in the opinion you're saying? Yes, in the opinion itself. The order is not clear where? In the opinion where the class definition is set forth, it says classes, plural. All right. I'm looking where exactly. At the beginning of the opinion? I can't give you the exact page number, but it's right above where the class definition is. It refers to classes, plural. Okay. Purported class action. Perhaps your co-counsel can point us to the specific. We certify the class under Rule 23B. It's page A36, the following classes. A36. And then it also is. Okay. The following classes. Okay. So there it's plural. And some of the later ones, it's singular. Okay. Can you tell us about the $1,200 payment? Was that specifically earmarked to go towards one or the other of the bases here of condition adjustment versus taxes? Or was it not earmarked? The $1,200 payment was specific to the valuation of the vehicle. Okay. Where is that in the record? In the record, it's clear in the CCC valuation itself, which is in the record at A1318 through A1336, where you can see that there's an adjustment to the vehicle valuation. Okay. But with the payment, where is the payment earmarked? One, I've got the valuation report up. How would we know that the $1,200 was for the valuation? There's testimony from Geico. And not, for example, for the taxes and fees? There's testimony from both Geico and plaintiffs that this $1,200 was a negotiation. Geico presented the valuation to plaintiffs. Plaintiffs reviewed the valuation. And plaintiffs submitted additional comparable vehicles to Geico. Geico took those additional comparable vehicles, reviewed them, did its own research, and averaged them. Is there a dispute on this? I mean, we'd like to hear from appellees as to whether everyone agrees that this covers the valuation difference. Plaintiffs claim that it's just a goodwill gesture. But is there any argument that this was like for both taxes, et cetera? Or was the number come up based just on the valuation issue? No, I do not believe there's any dispute that there was comparable vehicles submitted by plaintiffs, and that Geico reviewed those and reviewed, did its own research, and then came up with the $1,200 number. So the sole dispute is, is this goodwill or is this compensating for the difference? Correct. Yes, that's correct. All right, again, we'd like to hear whether you disagree with that or not, but go ahead. Okay, and with that $1,200 adjustment, there go plaintiff's damages. Okay, but not just damages. I mean, if this is two classes, then this goes to the standing for the first class. It does. It goes to standing. But then there's no problem with the second class. We aren't challenging standing with respect to the second class. And you also have not done anything to appeal the district court's finding that, you know, leased vehicles are like owned vehicles for purposes of taxes. I don't see any challenge in here to the tax, whether it's tax class or tax portion of a single class. We challenged it below. So we really focused our arguments with respect to this 23-F appeal on the valuation class, except for ascertainability. Right. Okay, there's no challenge before us on taxes with the possible exception of ascertainability. In this appeal, correct. Yes. Plaintiffs pled their cause of action as one claim with two theories about the breach of contract. Typically, we assess standing on a claim-by-claim basis. So why should we divide the claim into two different theories and, in your view, dismiss for lack of standing on one theory? Well, it's plaintiffs that have divided the class into two different theories and two different claims. They've separated it out in the class definition. The complaint is one. The complaint is one cause of action for breach of contract. Okay. But the claims are different. There's various distinct claims here. It's a breach of contract claim. So why should we treat it as two rather than one? And the district court just waffles on this. It's a breach of contract claim, but it's two very different bases for that breach of contract. And that's why there's two distinct class definitions. That's why there's two very different theories of this case and two distinct claims. Was it appropriate to plead just one claim in the complaint? I'm sorry? Was it appropriate to plead just one claim in the complaint, or should this have been divided up into two different breach of contract claims based on the two different theories? I think it would have been perhaps clearer to divide it up into two breach of contract causes of action, but combining two different causes of action under one heading is form over substance. It's two distinct claims. So you shouldn't allow standing merely because plaintiffs pled it all in one breach of contract. That would be an end run around the standing requirements. It would allow plaintiffs to merely plead everything as one breach of contract, even though they're distinct breaches, to get around standing issues. Can we divide the claim ourselves? I think the class is already divided. Not the class, the cause of action. The cause of action. Well, I think that's an interesting question. I think they are distinct claims, so. I think they're distinct theories. They're distinct theories. I don't know if they're distinct claims. Well, they're definitely distinct theories. And, again, if you were to say that any theory can just be put under one cause of action and that would allow for standing for any theory, even ones that they're not harmed in, I think that really is doing an end run around Article III standing requirements. There might be standing because they go to the amount of damage remedy, and there would still be a typicality represented in this problem there. So they get out of one problem and into another. Oh, absolutely. The issues that you're raising really go to Rule 23B3's predominance requirements. They go to typicality and adequacy. Absolutely. So even if plaintiffs here could survive a standing challenge on the valuation claims, it certainly highlights the predominance issues that are prevalent in this case. Okay. Then there's no predominance or typicality issue before us on taxes. There's a little bit of ascertainability. And, again, your friends can tell us if they think that's not preserved or something. But all the rest of that you just, you know. Should we maybe, if the district court is waffling between one and two classes, should we read it as a single class with two subclasses? If the court were to read it as a single class with two subclasses, yes, I think that that could potentially work. And then the plaintiffs would not have standing to represent a class relating to the valuation subclass. And there's certainly inordinate predominance issues with respect to that subclass as well. Right. So I think our arguments would remain the same regardless. But there's no, there's not a notice problem here that the people who would have to be notified of the class, et cetera, appropriately, you know, there's not a problem notifying them then. With respect to noticing them with respect to the valuation claim, I mean, there is an issue in that you'd be over-noticing. I mean, plaintiffs would propose to provide notice to anyone that suffered a total loss. So you'd be noticing folks that weren't injured. All right. But the court could ultimately then, the district court could cut that back. Correct. If the district court dismisses the valuation claims or if this court reverses and finds it's not appropriate for certification, then notice could go out. I mean, there are ascertainability issues because, as Your Honor pointed out, sales tax on leased vehicles is a very nuanced issue. And it's not records that we keep, that GEICO keeps, because the leased vehicle analysis is very complicated. We need information from each of the insurance in order to ascertain whether or not they were paid sales tax. I just want to go back to standing for a minute. Do you agree that the Lewis's have standing on the tax claim or the tax theory of the claim? The Lewis's were not paid sales tax. So, yes, they were not paid sales tax. Even though they were lessees, it doesn't matter. They have standing. They would have standing to bring a leased vehicle sales tax class action. Okay. Yes. Now, we still believe that, as we argue below, that there's various predominance issues with respect to that. But that's not before this court today. I just wanted to tie up the standing piece. No, absolutely. But, as I said earlier, even if this court were to find that the plaintiffs had standing to move their claims forward, there are inordinate predominance issues here, in addition to typicality and adequacy issues and the fact that plaintiff's damages model does not determine actual cash value. At best, all it does is identify whether or not an equating condition adjustment was applied. Do you have anything else to say? No. All right. We'll get you back on record. Great. Thank you so much. Mr. Dagerson for amicus?  Dagerson. You got it right. Exactly. Thank you. I'm pleased to call it. Samir Dagerson for amicus CCC, and I'd like to reserve two minutes for rebuttal. So I think that I would like to focus on the predominance issues because those are the ones that are central to CCC and urge this court to align itself with what the Ninth Circuit did in Lara and what the Fifth Circuit did in Samson and find that this exact kind of claim leads to too many individualized inquiries to satisfy Rule 23B3. And I think the key to this is understanding the sort of condition adjustment process, which is a two-step process, and I think once you fully understand that process, which is highly mischaracterized in Apelli's brief, I think it becomes clear why this is an individualized assessment, and that's how the Ninth Circuit understood it in Lara 2. So the condition adjustment is really itself a two-step process. Step one sets the baseline, and then step two is an individualized assessment of the loss vehicle that depends on where you set the baseline at step one. So the two parts of that process are completely inseparable, and it makes no sense to separate them out as plaintiffs try to do. So why do we do the baseline adjustment? We do the baseline adjustment based on the accepted premise that cars that are a dealership are in generally better condition than private use vehicles. If you walk around the street and look at cars, they are far worse than the cars that you end up seeing on a dealership. Most of those cars you see on the street end up getting scrapped, and when they are sold to the dealership, the dealer makes substantial improvements, improves the windows, the tires, all kinds of things. Isn't that anything but accepted? Isn't that the entire basis of the condition adjustment theory in this case that, you know, I mean, here we have the Lewises who had a three-month-old car. That really sounds like all evidence shows that it probably wasn't as good or a better condition than a dealer. Exactly, Your Honor. So at step one, you set the baseline, which is you make the assumption that what you're going to compare the loss vehicle to is a private use vehicle. So that means you deduct and, you know, CCC, based on extensive survey evidence, sort of figures out what the market value difference is between your average, your normal dealer-ready car of this kind and your private use vehicle, and it makes the assumption that we're going to compare the loss vehicle to the average private use vehicle. But then if, as is the case here with the Lewises, the car is in pretty good condition, there's an individualized assessment at step two, and you see that here, where on nine different criteria, they look at the loss vehicle, and it was found to be on five of those criteria in dealer-ready condition, in one of those criteria in exceptional condition, and three of those criteria in private use condition. And based on that, there was a significant upward adjustment. So they did a $1,066 downward adjustment at step one. That just sets the baseline. And then there was a more than $800 upward adjustment at step two. And so that is just a way of saying this car is almost in dealer-ready condition, so we're going to give you the amount of money that is almost the same amount as you would have at the dealership, and then, of course, she negotiated and eventually was able to get over $1,000 more than any comparable in the market. So she walked away with a significantly more amount of money. But the key point here is the plaintiff's theory of this case is that everyone is entitled to the upward adjustment at step two plus the baseline adjustment at step one. So in that situation, you get a significant windfall because you only got the upward adjustment at step two because there was a downward adjustment at step one. So to be clear, we could do this two different ways, and it's up to the customer how they do it. You can set the baseline at dealer-ready and then do a bunch of downward adjustments from there, or you can set the baseline at private use and do a bunch of upward adjustments from there, and you end up at the same place. I'm just wondering why this is an issue at the class certification stage, as opposed to the merits. I mean, I gather this is your explanation, but I would like to hear what FLEs have to say about it, because I think their theory seems to be that, you know, the baseline at step one has these ripple effects that aren't canceled out entirely at step two. It's not about canceling out entirely at step two. Maybe it is in some situations, and maybe it isn't, but that requires an individualized assessment, because whether it's going to be canceled out depends on whether or not you got actual cash value, fair market value for your vehicle. And the only way to do that, as the Ninth Circuit said and Laura means, is you have to look at the pre-accident value of the car and then compare that with what each person was offered to see if the offer was less than actual value. If the condition adjustment was applied for a plaintiff, and that plaintiff still got an amount equal to what he or she would have gotten if the adjustment was not applied, then there would be no breach of contract and no injury. That is absolutely right. There's no way, you know, all of the things that they say in their brief are, you know, these condition adjustments are badly done. You should have been more inspections of dealerships. You didn't do a careful enough inspection at step two. All that stuff does not lead to an injury across the board. If you were to present all that information to a jury, they could not determine that every single class member was injured. The only way you could do that is by going class member by class member and having a process that looks like an appraisal, which is to figure out how much someone was actually paid and how much they were owed. And that's exactly what the Ninth Circuit found in Laura and what the Fifth Circuit found in Samson. And the mischaracterization of the process underscores this because what they want is a windfall. They think everyone should just get the amount of the baseline adjustment. Why do they say that? They say that because they're trying to avoid the fact that this is an inherently individualized inquiry. If they just said everyone should just get the amount that they're owed if you went through the correct process, if they were not these mistakes, then they would have to say, well, that amount is going to be different for everyone and some people are just not going to be injured. It's just not true that every single person could have been injured, even if this process was allegedly defective. So what instead they say is, well, why don't we just give everyone the baseline adjustment? And that just doesn't make any sense because that means that everyone in the class is going to get a windfall. They're going to get the amount, the upward adjustment they got, because the baseline adjustment was set at private use instead of dealer ready. Plus, they're going to get the amount of the baseline. I guess you could also dispense with the assumptions and the adjustments altogether and just look at every car and come up with an actual cash value on an individualized basis. Right, exactly. Don't make any assumptions. Just look at each car. That is a way in which you can do it. That's a way you can do it. This process that CCC does has been approved by the New Jersey Department of Insurance. It's been approved by every single insurance regulator that has considered it, and it's absolutely a process that is an accepted way of doing this. They criticize a lot the idea that there aren't enough individual inspections of cars in the dealership. CCC is the only inspection company that does anything like that. Every other valuation company doesn't do physical inspections at all. Even on their own evidence, their own experts said that 50% of cars in this sample had at least one comparable vehicle that was physically inspected, and 29% had all vehicles that were physically inspected. Obviously, in some of these instances, CCC is getting the valuation right. Even if you were to present all of the, even if you take all of their allegations, all of their merits allegations as being true, and say CCC's process was defective, that doesn't mean that you could know in each individual case whether someone got actual cash value or not. And if ultimately the question is you have an entitlement, this is a breach of contract case, everyone agrees an element of this is injury, and the only people who can recover are people who are injured, and the only entitlement they have under the contract, and this is at A149, is the actual cash value of the replacement of the auto. Even the New Jersey regulations define it as fair market value. All of those regulations contemplate that condition adjustments are permissible, and even on page 8 of their own brief, they say New Jersey law requires the auto insurer provide compensation for the actual cash value, generally defined as the cost to replace the vehicle. If someone gets more, in the end, gets more than the cost to replace the vehicle, they have not been injured, they don't have a claim. Some people are going to get the right amount. Ms. Sherry probably got, you know, Ms. Sherry got more than anyone else who, than any, you know, dealer was offering their car at, so she walked away probably with an extra $1,000. You know, who knows? Maybe she could make out a claim that she still got too little, but that's all going to be based on figuring out what was her car really worth and what was she offered. Thank you, Mr. Dickerson. Thank you. Mr. DeStefano? DeStefano? Correct. Okay. John DeStefano for the plaintiffs and the class. The district court was well within its discretion to certify a class in this case based on GEICO's class-wide underpayment of total loss claims when it omitted taxes and fees and applied a baseless condition adjustment to the values of comparable vehicles. Could you start where we started with appellants? Should we understand this to be a single class, as two classes, or as one class with two subclasses? We understand it really to be two classes because these are not coextensive populations, although they do overlap to a large extent. One class encompasses everybody who had a total loss claim and wasn't paid taxes and fees. Part of that goes only to lease vehicles. You and your friends on the other side agree in viewing this as two classes. Yes, Your Honor. And the $1,200 payment, your friends on the other side understood that to be, have been negotiated based on the amount of the condition adjustment. Is that your understanding too? Now, you may view it as a goodwill payment and not legally satisfying, but do you understand that that's how the value was arrived at of that payment? We do take the position that it is a goodwill payment on the merits that should be considered in that capacity, but the claims diary at A1357-58 reflects GEICO's internal reasoning that it was averaging the CCC report with other resources, with an added value, with some comparable vehicles. If we tie it to anything, we tie it to undervaluation, not to taxes. Correct. Okay. Got it. And it's important to note on that issue that the CCC report containing the challenged condition adjustments still tainted the outcome in that instance. In other words, because on GEICO's best day, if the calculation was an average of those sources, then the condition adjustment was baked into that average. All right. So you had no, your friends on the other side do not challenge most anything that relates to taxes, with the possible exception of ascertainability. Do you think that's in the case, and is there anything you want to say about ascertainability on that before we focus the rest of the argument on the undervaluation class? We believe the district court was correct in its finding, in its discretionary finding, that the class could be ascertained based on the discovery that we presented, which was not limited to GEICO's specific records on taxes, but really synthesized GEICO's valuation data, sample of claim files, and GEICO's own testimony about its practices on taxes and fees. Its fee practice was admitted to apply universally, its tax practice as to the lease vehicles prior to 2020. And putting together the sources of information, it's actually a fairly straightforward process of identifying those individual class members. I'm sorry, I think Judge Freeman wanted to ask something, but that was all I wanted on that piece of it. Have you presented evidence contradicting their evidence that they don't keep records as to the taxes and fees and who was paid? Yes, Your Honor. In the declaration, and it's particularly the rebuttal declaration of Larry Houseman Cohen, there's a fairly in-depth analysis to confirm what we already know, that is that they were not applying the tax, they were not including taxes with payments on leased vehicles, and there were cross-checks between the different databases that GEICO produced in the case, and then cross-checks against our sample claim files. We conducted an additional sample specific to taxes to confirm that the non-payment of taxes corresponded perfectly to the existence of a leased vehicle in the transaction, and also that there were no tax-exempt entities involved. We did a class-wide review in that respect. Okay. Anything else on that piece of it? No. All right. Well, let's talk about the first class then, the undervaluation class. I guess listed second on page 836. How in the world did the named plaintiffs here have standing? Does the standing issue turn entirely on whether we understand the $1,200 to be a goodwill payment? Because if we don't understand it to be a goodwill payment, you got more than the amount of the evaluation, and therefore haven't suffered an injury. Maybe unnamed plaintiffs have, but you need standing for the named plaintiffs. The only named plaintiffs here got the $1,200 that more than competes the 1066, right? So your whole argument for standing hinges on whether we understand that to be compensation or a goodwill payment, right? No. We believe that the standing exists either way. How? For two reasons. How could it exist if this was compensation for the undervaluation? On the one hand, because GEICO used the same tainted valuation in calculating that amount. So if the deduction had not been included in the CCC report, then the ultimate average of the CCC report with the NADA guy, with these other comparable vehicles, would have been different. Where is that in the record? At best. Again, the claims diary at A1357-58, and then if you take the CCC evaluation report that contains the adjustment to settle, an instance of that is at A896. Ultimately, the plaintiffs say that the condition adjustment, they were harmed essentially by about $1,000, $1,006, right, taken off by the condition adjustment. But then they got $800-some upward plus another $1,200 upward. So it seems that they recouped that thousand and then some. And that's on the face of the complaint. So how were they individually harmed by that initial loss when they came up with so much before they even filed this complaint? To get there really requires accepting GEICO and CCC's merits defenses, which is improper at the class certification stage. Those are both disputed theories about liability. I'll come to what we call the offset theory, the adjustment to the loss vehicle second. But just to finish off this $1,200 point, as the court observed before, there's nothing that ties the $1,200 to any specific aspect of the valuation, let alone the condition adjustment. It's not the same amount. It could be in consideration of anything. And when the report at A896 still contains the condition adjustments to comparable vehicles, they were still reducing the amount when the adjustment to settle was added in. Our contention is that the plaintiffs were entitled to the valuation plus the adjustment to settle plus the condition adjustment, which should not have been a part of the calculation. And when this report was averaged with the other sources, if that's what GEICO did, the condition adjustment still exerted a downward effect. Where's the math? Where's the math that shows that you were entitled to more than $1,200 more than you got? Because you received $17,258 in total. Where can we see your breakdown that shows that you would have gotten more but for this condition adjustment or the value? The math is in New Jersey law because New Jersey law requires GEICO to adopt a consistent methodology for calculating the value of total loss. But there's nowhere in your briefs or in the record that has kind of broken down, here's how we think it should have been computed. It would simply be adding back the deduction. They've more than added back the deduction. No, they have not. The deduction still appears on the face of the report. Let's say the deduction still appeared on the face of the report, but GEICO said, this is counterfactual, look, adjustment whatever, just take another $5,000 and go away. Would they be made whole at that point? The condition of the judgment is still in the record. Again, we think that there's still a controversy in that instance about what the impact of that $5,000 was. Make it $50,000. If it was an illegal deduction, it should not have been taken. But where is the concrete injury? The concrete injury is, again, because New Jersey law specifically prescribes the methodology that must be used and things that can and can't be taken as deductions and adjustments in a total loss valuation. This one wasn't based on. That seems like an informational injury. I don't see a pocketbook injury here. You have not computed, and we would expect you to compute, how many fewer dollars are in the Louis's pockets here? And you're just saying New Jersey law requires prescribing it. Whatever New Jersey law says, that's not enough for Article III standing. You got to show us how many fewer dollars are in your client's pockets as a result. The calculation is a contractual requirement. It's not just. Fine, it's a contractual requirement, but there's no article. How many dollars are your clients out here? You have not explained that to us. The only answer is the thousand or so dollars of the condition adjustment. I mean, how many windfall dollars over the actual cash value would the Louis's have to receive in order for there to not be an injury? This ever is in favor of the insured are really not at issue here. Geico's responsibility is to carry out the valuation and determine the value as permitted by New Jersey law. And when a deduction is taken, that's not permitted. It's based on false information. Isn't there, isn't there obligation to pay the actual cash value at the end of the day? No, the New Jersey requires them to adopt the same method. If you were in New Jersey state court, you could sue for that, but you're in federal court and under Article III, you've got to explain what the injury in fact is. And the fact that you didn't quite break it down the right way is not enough here. You've got to show, you know, there's a pocketbook injury or something analogous to that. And you're just not answering our questions about that. So maybe you need to go back to New Jersey state court if you want to sue on that particular theory. But that theory is not enough in federal court. And I think my colleagues have the same question I do. How many dollars? Why isn't 1200 enough to compensate for that? This isn't a challenge about the actual cash value of the vehicles. It's a challenge to the deduction of an arbitrary amount that is, that is outside of what should take place in the valuation process. That's what the district court held in the Danicola Ortiz case. The district court recognized there is a valid claim upheld at the dismissal stage for applying arbitrary deductions to a valuation. And when those deductions are based in falsity, they are based in an unsubstantiated assumption about the conditions of comparable vehicles. They go outside of the bounds of what can take place in a permissible valuation. If Geico valued the vehicle thousands of dollars more than a class member expected, but then maybe took $500 back for, based on a coin toss or something like that, it would be analogous. You're never allowed to take that deduction. And the rest of the calculation stands. It's not contested in this case. I think that we're really feeling, I speak for myself, I'm feeling really constrained by what the Supreme Court told us in TransUnion, which is that a bare statutory violation is not enough. You have to allege a concrete injury. And I understand that this could have been the worst possible statutory violation that resulted in that $1,000 deduction. But ultimately, by the time this complaint was filed, that had been offset by over $2,000. And so where under TransUnion is there a concrete injury? The concrete injury is the fact that when they came up with that $1,200, again, they were still relying upon the impermissible deduction. The impermissible deduction was economically reducing even what the $1,200 should have been under their own methodology, number one. As to the other theory that the adjustment to the lost vehicle somehow offsets this adjustment to the comparable vehicles, that is a disputed merits issue, again, because this idea that the baseline somehow melds together those two calculations is wrong. Each value, each conditioning rating of the lost vehicle and the comparable vehicles is an independent finding by the insurance company. Why should we interrupt our consideration of what's happening here at that first stage, the condition adjustment stage? Why not go to the end of the process and compare the amount the Lewises have received against the actual value of their car? The only value that GEICO is allowed to use is the value that conforms to the calculation requirements. What's contracted for is a process of calculating. There's no other value to refer to. What CCC and GEICO are assuming is that there's some other measure out there. Where do we find that in the contract, that process obligation? The contract incorporates applicable insurance regulations. Contracts incorporate applicable regulations in general, but under New Jersey law, it incorporates applicable regulations and the process that the insurance company must follow to value the claim. Let's assume you're right. Let's assume we can somehow read TransUnion to allow this. You go from Sylla to Charybdis. You run into the problem that your client may have gotten overpaid, but all the other people in the class may have suffered a pocketbook injury. Your client gets at best nominal damages. So then your client isn't typical or representative. So if you have standing, you're then going to run into a Rule 23 problem, correct? Because the other people in the class actually got much less money because of this, and you didn't. The district court correctly recognized that whatever issues might need to be resolved as to that $1,200 payment, and this was a discretionary determination, would not derail the adjudication of the class-wide questions. And I think that was a correct determination that, again, we have a theory that the Lewises were harmed, that that $1,000 deduction was baked into their $1,200 payment at worst. And because of that, they will be fighting the same fight as the other class members with just a slightly different damages calculation. Is it fair to summarize your position as saying that even if at the end, let's stipulate, I'm asking you to stipulate, that the Lewises received the actual cash value or better, they're still injured because of the Step 1 condition adjustment? What they received could not have been the actual cash value because the condition adjustment was baked in. That's our theory. Right. So you don't have a burden to tell us whether they got more or less because the math process was off. The math process is the standard. That's our theory, and that can be adjudicated on a class-wide basis. We're not just here to decide whether or not that's right or wrong under Amgen. It's not the place of the district court of the 23 states to determine that. There is a market value, an actual cash value of the car, right? It's $25 or it's $35 or $15 or something. I mean, you could come up with the number using some method, correct? Different methods will produce a different specific number for the valuation, which is why New Jersey law and the contract hem in the insurance company and confine them to the one that they select. New Jersey, excuse me, the court is required under, excuse me, I'm sorry, GEICO is required under the administrative code 11-3-10.4D to use the same valuation methodology whenever possible for all total loss claims. So I think any class member with a loss, any class member insured under the contract has a contractual expectancy that the CCC method will be followed and then that it will also not include impermissible elements that violate New Jersey law, such as a deduction that's not based on a reasonable investigation. And counsel's statements about the inspections of those cars go to the heart of what's disputed in this case. We presented class-wide evidence that none of the cars are really inspected, though some of them are said to be, because while the lost vehicle gets this thorough going over that takes 45 minutes where they discover every flaw to identify whatever they can to reduce the value of that vehicle, the comparable vehicles are assumed to be in superior condition with a five-minute inspection or less that never includes the engine, that never includes the interior. So there's no basis in fact for that deduction. It doesn't meet the requirements of claims adjusting under the contract. Could I ask you to comment on Amicus, Mr. Diggerson's vigorous argument that with this two-step process, even if step one has a common baseline, step two does so much of kind of responding to different baselines where you are that it's too individualized for class treatment. The argument about the baseline doesn't address the measurement error. The measurement error is when GEICO asks what condition is the lost vehicle in, what condition is the comparable vehicle in, it inspects the lost vehicle. It ascertains a condition. But in the case of the comparable vehicles, their condition is never ascertained. That's the measurement error that basically would never permit GEICO to take the position that those cars are in superior condition by default. On an individual basis, those are individual comparable vehicles listed in the report. GEICO never has a basis to say that they're better than average and so their prices need to be reduced. It never inspects them. So essentially what CCC's argument is is an argument about the intercept, but it doesn't address the first problem, which is the assumption of the condition of the comparable vehicles. With respect to the Lara case, I'd like to speak to that. That case came up on a completely different evidentiary record as this one. The Western District of Washington had issued multiple rulings upholding claims that a mere failure to itemize would breach the contract. I litigated Lara. We presented class-wide proof in that case that those condition deductions were not itemized, should be stricken on that basis. And the court said, well, failure to itemize doesn't really amount to an error in the valuation. And so when that case went up, there was no evidence about the quality of the inspections, the failure to determine that comparable vehicles were in fact in superior condition. After the record was closed in Lara, we soldiered on and continued with discovery in this case through 2021 with emergent facts about the way that these inspections were conducted or not conducted and how they didn't satisfy the requirements of a reasonable investigation under the insurance code. So by the time this case came up for certification, there was proof that the deduction was wrong in amount, not just that it was a formatting error under TransUnion, but to get back to the court's point under TransUnion, we had a colorable argument that the amount of deduction was wrong. So to apply it was always an error in the amount of the ultimate valuation that was given to the insured. Because I don't recall, was there was standing raised in Lara? Did you fight over standing in Lara? Yes. And the arguments focused largely on this harm idea and the fact that a mere failure to itemize fell afoul of the TransUnion principle that formatting error would not result in any monetary harm. Beyond monetary harm, there is informational injury. The informational injury is the fact that class members who have a contractual right to receive a valuation before the time of payment are being misinformed about the basis for that calculation. They're being told that there is a deduction for the superior condition of comparable vehicles when there is no factual basis for that. There is a downstream adverse impact because class members are using that information to evaluate the numbers that they're given by the insurance company, decide whether or not they're going to go for an appraisal, whether or not to dispute the number, whether or not to seek legal advice. It is impairing their choice at the time they receive the valuation to not be told that that number is in fact baseless. And to get to that informational harm, you sort of have to leapfrog the monetary harm, which is the fact that it is baked into the calculation just as it was baked into the payment that was made to Ulysses. So Lara said it was too individualized, decertified the class, but the Lara opinion doesn't appear to say anything about standing either way. It doesn't. I'm loosely characterizing the arguments that were made in that case, which focused on the fact that plaintiffs had not presented class-wide evidence that the valuation was wrong because our claim focused on a failure to itemize. But the court in that case didn't have before it any of the evidence that the deduction itself wasn't a numerical error, that there was no basis for the amount of the deduction. And that exact distinction is drawn in the Clippinger v. State Farm case, Western District of Tennessee, August 25, 2023. The West Lost Site is 2023, WL7213796. To the extent Lara did go on and venture into whether cars needed to be valued individually or by relying on CCC's own internal calculations as they stood without the adjustment, that was the disputed merits issue in the case, and Lara is really contrary to Olian and Amgen. It's contrary to Amgen to adopt the defendant's theory of how cars should be valued. Our theory is that the contract required the CCC valuation to be used without the adjustment, and that regardless of legal requirements, the CCC valuations are GEICO's own handiwork as far as determining the values of the cars. They are competent evidence of value. So we're entitled to present to the trier of fact those valuations without the deduction. As competent evidence of value, and that difference money is the measure of the harm. In other words, the amounts of the deduction is the measure of the harm between the valuation without it and the valuation with it. GEICO even uses the comparable vehicle values without any type of conditioning adjustment in the case of private market vehicles, which is shown in the Houseman Cohen report at 866 in 1923. There's no requirement in New Jersey law to adjust the values of comparable vehicles. They are adjusted and deducted without any basis, and for that reason the contract is breached and harm results. If there are no further questions, I'll submit. Ms. Cochis? Ms. Cochis, is there anywhere in the record where Mr. DeStefano or counsel for appellees submitted a competing this car, the Lewis's car, should have been valued more than the amount that you've given them? No. There's nothing in the record that would substantiate that. And as all of you pointed out, there's nothing that would demonstrate that GEICO didn't pay more than the actual cash value. Just to touch on ascertainability quickly and the sales tax and fees arguments that GEICO made on appeal, the district court found that this class was ascertainable using GEICO's own data. But plaintiff's own expert stated that a file-by-file review is necessary, and then plaintiffs did conduct a sample file-by-file review, and they didn't get it right. They missed various components. They couldn't identify leased vehicles. They couldn't identify when payments were made. This is the quintessential case where there is no administrative feasibility to determining whether or not a vehicle is leased and then whether or not GEICO paid the sales tax, and then finally whether or not the insured received the sales tax from the state. You can't deny this information is in those files. The information, certain information is in the files, but there's certain information that we would need from the insureds. What information is there that you don't have? So, for example, and the district court didn't address any of these issues in its order, but, for example, as we argued below, the requirement in New Jersey, there is a provision in New Jersey regulations that allows for a reimbursement from the state of sales tax payments, so that's something the insured would need to tell us. Also, there's various ways for a person, a leasee in New Jersey, to pay for sales tax on leased vehicles, and so that is something that only the individual leasing the vehicle would understand. So those are all things that would need to be determined in order to figure out if this person was not paid sales tax. Well, requirement for their submitting a proof of claim. If they want to claim the damages, then they have to submit the evidence that they paid the sales taxes and weren't reimbursed. It's possible that there's a way to construct the class in order to use information from the insured and from GEICO in order to determine whether or not it was paid sales tax, but that's not something the district court considered. If the panel has no more questions, then we'll submit. Thank you so much. Mr. Dagerson, do you have anything else? Just three very quick things, Your Honor. First, the same problems that this court has identified with standing, they all apply to predominance because this is what this class looks like. This class is people who have upward adjustments at step two. They have people where GEICO didn't use the MVR or made discretionary adjustments, and they have people who had adjustments to settle. That all just shows if the ultimate question is actual cash value, then that's going to be different for different people, and plaintiff's theory just requires giving all kinds of windfalls across the board, that lots of people who have got more money than any comparable vehicle, any comparable replacement auto are going to get additional money, and there's just no basis for that. Second, as they put it, they said the math process is the actual cash value, so presumably that means even if someone got $100,000, if the math process was wrong, that is the actual cash value was $105,000, even if every comparable vehicle costs $15,000. That doesn't make any sense. That's nowhere in the regulations. The regulations here specifically state at 10.4.8.3.3, the fair market value of the insured vehicle. That's what this is all trained on. And then finally, on this question of the merits, this is not a merits issue. Obviously, as the Supreme Court has explained, sometimes there is overlap with the merits when you have to understand whether the certification requirements are met. But as this court said in Reinegg, a district court must look first to the elements of the plaintiff's underlying claim and then through the prism of Rule 23, undertake a rigorous assessment of their profit proof, and if the proof of essential elements of the claim requires individual treatment, then class certification is unsuitable. The essential elements of this claim, and this is why I don't think it's just a TransUnion issue, TransUnion reinforces this, but the breach of contract here, an element of that, everyone agrees, is injury, is resulting damage, and they can't prove that without looking to what the actual cash value is of each of those individual people. That is not a merits question, and this court can look beyond and figure out what's actually going on here. They don't just have to accept the proffer that everyone is entitled to the condition adjustment. Thank you. Thank you. We thank all the parties for a very helpful briefing and argument. We ask that the parties work together to prepare a transcript. If we could go off the record for a moment, we'd like to thank counsel at sidebar.